# Carter v. Chevalier.

### Statutory Action of Ejectment.

1. *Deed; general and particular description.*—When lands are described in a deed, by a general and a particular description of them, and the two are repugnant to each other, the particular description will prevail, and the other will be rejected as false.

2. *Adverse possession; color of title.*—A party claiming land by adverse possession, may introduce in evidence deeds under which he claims, to show claim or color of title on which to base his possession, even though such deeds are insufficient to show paper title in him.

3. *Same; continuity of possession; tacking possession.*—Continuity is an indispensable element of an adverse possession. If several enter at different times, and there is not a privity of estate between them, the several possessions cannot be tacked, so as to make continuity of possession on which the statute of limitations will operate, but if there is such privity, for the purpose of completing the bar, such possessions may be tacked and treated as one continuous holding.

4. *Regaining title lost by adverse possession.*—A plaintiff, having the legal title, even if it had been interrupted by a ten years adverse possession by the defendant, who thereafter, while the property is vacant, takes actual adverse possession of any part thereof, his possession will extend to the entire tract as described in his title, and if such possession continues for ten years before a re-entry by the defendant, it would oust the claim of the latter, and support ejectment by the plaintiff against him for the land covered by his original title.

APPEAL from Mobile Circuit Court.

Tried before Hon. J. T. JONES.

This was a statutory action of ejectment, brought by Braxton E. Carter and others, against George Chevalier. There was a judgment for the defendant, from which the plaintiff appealed. The facts are stated in the opinion.

F. G. BROMBERG for appellants.

PILLANS, TORREY & HANNA *contra*.

HARALSON, J.—The property is described in the complaint as situate in the county of Mobile, State of Alabama, under a *videlicet*, as "on the Government street road, next east of the late residence of the late Dr. J. H. Woodcock, being a part of the fractional section numbered (20) twenty, Township (4) four, South, in Range (1) one, West, and described as follows, viz." Then follows a more particular description by metes and bounds.

The defendant took issue upon the complaint, and the defense, as developed by the evidence was, not that the defendant had paper title which he could trace to the government, but that he, and those under whom he claimed, had held continuous adverse possession of the property sued for, for ten years before suit brought.

The plaintiffs claimed to derive title from the government by virtue of a grant from Spain to one Benjamin Dubroca, of date 26th February, 1803, of what is known and called the "Dubroca Tract," confirmed by act of Congress of date, May 27th, 1840, to the heirs of Wm. E. Kennedy, on which a patent afterwards issued to them, on the 20th day of February, 1885; but in this patent, the land is described as lying in section 24.

The defendant, in order to show color of title, introduced thirteen successive deeds more particularly referred to hereafter; the first, from Julia Elder and husband, to Duke W. Goodman, of date, January 10th, 1849, and the last, from E. Majerski and wife to himself, of date February 16th, 1892, in each of which deeds, the property conveyed is described in the same manner, and as described in the complaint,—as lying in fractional section twenty, followed by substantially the same more particular description by metes and bounds. There was no suggestion, so far as appears, in the course of the trial, that the land sued for was misdescribed in the complaint, or that defendant was not in possession of and resisting a recovery by plaintiff in this suit, of the identical land of which he was in possession. Indeed his plea admitted possession. Nor was there any objection to the admission of the evidence tending to show title from the government to plaintiffs, or that their patent was to section 24, and not to fractional section 20. The charges asked by defendant are set out in the transcript, and neither related to a variance between the alle-

[Carter v. Chevalier.]

gations of the complaint and the proofs.   Each of them had reference to defendant's alleged adverse possession of ten years before the institution of this suit.   A copy of the official map of the surveyor general of the public lands in Alabama, of date 12th August, 1846, introduced without objection, including the lands in suit, as well as the evidence of witnesses examined, leave no doubt that this particular piece of land was included in the said Spanish grant to Benjamin Dubroca, title to which was afterwards, on the 27th May, 1840, confirmed to the heirs of Wm. E Kennedy by said act of Congress of that date.   So far as the particular description of the tract of land in suit goes, that was not in any wise brought into dispute in the court below, the only alleged variance suggested for the first time in this court is, as to the allegation that the land sued for is in fractional section 20, whereas, the proof shows it to be in section 24, according to the United States survey.   By the same description adopted by plaintiffs in their complaint, as we have said, the defendant claims the land according to the description in his own and the deeds of those from whom he claims, under color of title.   Mr. Nichol, an experienced surveyor, a short while before this suit was tried, surveyed and mapped this particular ten acre plat of land, and states that "the pink lines in said map denote the boundaries of the Wm. E. Kennedy tract of land, which was otherwise known as the ''Dubroca Tract," and the part of said tract, surrounded by blue lines (within the pink) denoted the lands occupied by defendant and described in the complaint in this case, *   *   *   that when he made the map he had a copy of the United States map—Exhibit F. to the bill of exceptions—before him, in addition to other matter, and also the patent of the United States to the heirs of Wm. E. Kennedy—Exhibit A. to the bill of exceptions ; that the corners of the plat made by him, were identical with those of the patent; that the land sued for and described in the complaint, lies entirely in section 24 of the United States land office map of fractional township 4 south, range 1, west—Exhibit F. to the bill of exceptions; that the section in which the land described in the complaint lay, might be described, either as in United States section 20, or in the Spanish grant section 24 ;   *   *   *   that section 24 of the United States land office map—Exhibit

[Carter v. Chevalier.]

F. to bill of exceptions—was fixed mathematically, and by the Spanish grant." So, we repeat, the same description has been adopted and acted on throughout the litigation by both sides, is so definite as would enable a surveyor to accurately locate and define it, and is not ambiguous in any sense. We may not understand, why the land is designated as lying in fractional section 20, instead of section 24, according to the United States survey; but, however that may be, the description by the section, was followed by the more particular description by boundaries, the latter of which is not disputed. The well settled doctrine is, that when lands are described, even in a deed, by a general and a particular description of them, and the two are repugnant to each other, the particular description will control, and the other will be rejected as false.—*Sikes v. Shows*, 74 Ala. 382; Dev. Deeds, § 1039; 1 Gr. Ev., § 301. Accordingly, we find as an illustration of the doctrine, in the last authority cited, this statement: "And so, where the land was described in a patent as lying in the county of M. and further described by natural monuments, and it appeared the land described by natural monuments was in the county of H., and not of M., that part of the description which related to the county of M. was rejected."

There is no dispute as to the fact, that plaintiffs are the heirs of Wm. Kennedy. It is stated in the bill of exceptions, that Wm. E. Kennedy died April 3rd, 1825, and that Mary E. Carter was one of his heirs, and died before the bringing of this suit, and it was admitted that the plaintiffs are all of the heirs of said Mary E. Carter deceased." It was further shown that by a partition between the Kennedy heirs, as shown by their deed of 1st day of August, 1850, this "Dubroca Tract," was set apart and conveyed by them to said Mary E. Carter. It is contended by defendants, that this deed of partition does not show title to this particular tract to have been conveyed to said Mary E., since the proof shows, that there were three tracts with the same designation, and the deed does not identify the particular one of them, which was set apart to her.

But this is a mistake. The two other tracts referred to, were numbered in the register of claims in the general land office, 16 and 17, and were claims of Hilaire and Maximilian Dubroca, respectively, of 640 acres,

[Carter v. Chevalier.]

each, and arose by virtue of a grant from the French
government to their father, to which, as the commis-
sioner states, "they have not produced any written evi-
dence whatever, from 1789, to June 1813." The claim
of these heirs, through their ancestor, Kennedy, arose
through one Benjamin Dubroca, for eight hundred
arpens, by virtue of the said Spanish grant, and said act
of Congress to which reference has been made,—an en-
tirely different tract from the other two.

The register of the land office, was admitted in evi-
dence against the proper objection of plaintiffs, and it.
ought to be stated, was improperly allowed to be intro-
duced. It had no relevancy to the lot sued for.

By the evidence, it satisfactorily appears; that the
plaintiffs own the legal title to this tract of land sued
for, derived from the government, unless they have been
disseized by the defendant and those under whom he
claims, by a continuous adverse possession for ten years
before suit brought. The burden is on him to establish
this title, and if he fails, of course he has no case. He
claims directly under a deed from one Majerski and wife,
of date Feb. 16, 1892. The defendant introduced twelve
other deeds, beginning with the one from Franklin C.
Heard and wife, to Julia Elder, of date April 12, 1846.
These deeds were properly admitted in evidence, not to
show an original paper title in defendant, better and
older than plaintiffs, but to show claim and color of title,
on which to base his alleged adverse possession for the
period to bar plaintiffs' title.

Julia Elder and her husband conveyed to Duke W.
Goodman, by deed dated January 10, 1849. Goodman
and wife conveyed to Wm. Hudson, by deed of 22nd
May, 1849; and Hudson and wife to Robert Dent, on
April 26th 1853; and he to Dennis Dent, in trust for
Frances and George Dent, by deed bearing date the
——————day of——————1850, but not acknow-
ledged or filed for record, until the 5th of January, 1854;
and Dennis Dent and wife, to Charles A. Marston, by
deed dated 21st January 1860; and he to Robert W.
Hallett, by deed of November 10th, 1861; and he to
Mary Holcombe, by deed dated July 13, 1863; and she
to Robert W. Hallett, by deed of January 8, 1864; 'and
he to Charles A. Marston, by deed of March 8, 1864;
and he to Catherine McCarron, by deed of July 13, 1868;

[Carter v. Chevalier.]

and she to Emile Majerski, by deed of July 15, 1868, and he, as above stated, to defendant, by deed of February 16, 1892.

The defendant failed to prove, that any of these grantors were ever in the actual possession of said property, except Mrs. Elder and her husband, and Dennis Dent. Franklin C. Heard, the parent grantor, is not shown, certainly, ever to have lived on the land, nor does it appear what claim or right he had, if any, to the property. The defendant's proof does show, that he lived west of this lot, with the Woodcock lot intervening. It was shown, that Mrs. Elder and her husband built a house on the lot, but how long they occupied it, is not shown. Their title, whatever it was, lasted only about two years and nine months. The proof as to Dent's occupancy was by Dr. Owen, who testified that he lived there one summer, and by Mr. Bright, that he lived there from the Fall of 1852 to the summer of 1853. The defendant's proof does further show, that the place was very well kept up, to the time of the war; that the house on it was destroyed in 1865, and no one occupied or was in possession of it, until defendant entered under his deed from Majerski in 1892. It will be seen, that with the exception of Dent, there is no proof of the actual possession of this lot by any one from whom defendant proposes to derive title by adverse possession, for any definite time, and in Dent's case, the proof shows a very temporary possession by him, not longer than from three to six months. Continuity is an indispensable element of an adverse possession. If several enter at different times, and there is not a privity of estate between them, such as ancestor and heir, vendor and vendee, landlord and tenant, the several possessions cannot be tacked, so as to make continuity of possession on which the statute of limitations will operate; but if there is such privity, for the purpose of completing the bar, such possessions may be tacked and treated as one continuous holding. *Riggs v. Fuller*, 54 Ala. 141; *Lucy v. Tenn. & C. R. R. Co.*, 92 Ala. 246. Admitting defendant's right to tack any of these alleged holdings, we are left by his proof entirely in the dark, as to the period under each one that might be so connected, except from April, 1892, when defendant entered, to July 18th, 1893, when this suit was commenced, and for about three to

six months possession by Dent. As to how long Elder, Heard and Hudson held, if the two latter ever held at all, we are left entirely to conjecture ; and, as has been stated, we are without any proof that any of the other vendors were ever even on the land, or had anything to do with it, except to buy and receive a conveyance and sell and give one. So far, then, we have nothing on which to base an adverse holding of ten years by the defendant.

But, outside of this, the defendant has shown the entry on and possession of the premises by one Sage. George Sage testified, that his father moved on the place, in the early spring of 1853, when the witness was a boy, eight years old ; that his father died in 1861, and his mother removed from the place in the Fall of 1864 ; that his father claimed the place by contract with Charles Marston, and said he purchased it from him, but no title appears ever to have been made by Marston to Sage. The proof as made by the defendant, is in rather a singular and contradictory state, as to Sage's possession. Dr. Owen, who seemed to enjoy good opportunities for knowing, says, that Sage lived there "a short while," he did not know how long. Glennon, another witness of defendant testified, that he knew the place in 1857 or 1858, and Sage's family lived there then. The deeds introduced by defendant, as color of title, show that Charles Marston, under whom it is claimed Sage entered, did not acquire his deed to the land, until January 1, 1860, and he conveyed to Hallett, May 10, 1861. It is difficult to understand, therefore, how Sage could have gone into the possession of the land under a contract of purchase from Marston in 1853, when it is shown that Marston had no title, and is not shown to have set up any claim, before January 1, 1860. The true explanation, perhaps, is, that George Sage, who was a boy only about 8 years of age at the time, was mistaken in saying that his father went in possession in 1853, by an arrangement with Marston, but that it was in 1863, when he entered under such arrangement. This comports with the statement of defendant's other witness, Dr. Owen, who testified that Sage occupied the lot "a short while." But, allowing that he went in, in the early Spring of 1863, and vacated at the beginning of the Fall of 1864, and allowing this to be

tacked to the other possessions shown, and deducting the period during the war, in which the statute did not run, and we still have a period of continuous possessions under all these holdings, so far as has been made to appear, of less than ten years. The defendant failed, therefore, to make good the defense of ten years adverse possession.

The evidence shows, that the Dubroca tract, was outlying from Mobile, several miles from the court house, of nearly 700 acres, and for the most part uncultivated, grown up lands,—just such a territory as on which its owners would bestow little or no attention. Its precise boundaries were probably unascertained, until Nichol surveyed it, some three months before the trial of this case; and for these reasons, it might have been easily encroached upon by co-terminous proprietors, without any intention of appropriating or claiming land as their own that did not belong to them. The lot in question lay on the extreme west of the tract, was narrow in width, from east to west,—some two or three hundred feet,—and running north and south with such width, in the shape of a parallelogram, and with length enough, to make ten acres. In these facts, may be found the true reasons, perhaps, for parties buying and selling this strip of land, who had no title to it, and for the plaintiffs not asserting earlier, their title to it. The plaintiffs do show, that at different times, in these many years, they exercised acts of ownership over the tract by selling and renting parts of of it. The witness, Hawland, testified,—and he is uncontradicted,—that he had been the plaintiffs' agent for leasing and selling the lands in this tract, since October, 1875; that he had been acquainted with the land in suit since he was a boy, and had known all about it, since 1875; that plaintiffs before that date, leased some of the lands in the tract, and have sold some of them since to different parties; that this lot and other adjoining lots, as shown on the map, were all open, having small trees coming up on them now; that when he became agent for plaintiffs in Oct. 1875, there were no signs of any occupancy of the lands thereabouts at all, and in October, 1887, he put a good lawful wire fence around the lands, adjoining the lot sued for, including it and lots 10, 11 and 13, as indicated on the map, and since 1878 has paid the taxes

[Howard v. The State.]

on the Dubroca Tract. In other words, the proofs show, that since 1875, and even before that time, the plaintiffs have been in the possession of said land, with their title from the government, exercising such acts of ownership over them as have been referred to, and such as the nature and condition of the lands admitted. Having the legal title, even if it had been interrupted by a ten years adverse intrusion before 1865, if thereafter, prior to 1875 and since, the plaintiffs exercised actual and adverse possession of any part of the tract, such as openly claiming, selling and renting different parts of the same, their possession would extend to the entire tract as described in their title, and if such adverse possession continued for ten years, before the possession of defendant under his claim of title begun in 1892, it would oust his claim, and support ejectment by plaintiffs against him for the lot. *Hoffman v. White*, 90 Ala. 356; *Norment v. Eureka Co.*, 98 Ala. 189.

It follows from what has been said, that the general charge as requested should have been given for plaintiffs. This relieves us from reviewing the many other assignments of error. The same questions will probably not arise, on another trial.

Reversed and remanded.